# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THOMAS BENZ,

        Plaintiff,

    v.                                     Case No. 04-C-1079

ROGERS MEMORIAL HOSPITAL, INC.,

        Defendant.

## DECISION AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT

### I. PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on November 5, 2004, when the plaintiff, Thomas Benz ("Benz") filed a complaint in the United States District Court for the Eastern District of Wisconsin alleging that he was discriminated against on the basis of his religion, in violation of Title VII of the Civil Rights Act of 1964. Specifically, the plaintiff alleges that the defendant terminated him because he is a member of the Wiccan religion.

Currently pending before the court are the parties' cross motions for summary judgment. The motions are fully briefed and are ready for resolution. For the reasons which follow, the defendant's motion for summary judgment will be denied, and the plaintiff's motion for summary judgment will also be denied.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment contained responses to the

defendant's proposed findings of fact. The plaintiff's motion for summary judgment was also accompanied by a set of proposed findings of fact. Likewise, the defendant's response to the plaintiff's motion for summary judgment contained responses to the plaintiff's proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the cross motions for summary judgment.

Benz is an adult resident of the State of Wisconsin. (Defendant's Proposed Finding of Fact ("DPFOF") ¶ 1; Plaintiff's Proposed Finding of Fact ("PPFOF") ¶ 2.) Rogers Memorial Hospital ("Rogers Memorial") specializes in residential treatment programs for adults and children with psychiatric, emotional, and behavioral disorders. (DPFOF ¶ 2; PPFOF ¶ 1.)

Rogers Memorial has four residential programs: (1) the Eating Disorder Center; (2) the Obsessive-Compulsive Disorder Center; (3) the Child and Adolescent Center; and (4) the Herrington Recovery Center, which deals with drug and alcohol addiction. (DPFOF ¶ 3.)

Benz began working for Rogers Memorial in May of 2003 as a residential counselor. (DPFOF ¶ 7; PPFOF ¶¶ 6,7.) Initially, Benz was assigned to the Obsessive-Compulsive Disorder ("OCD") Center. (DPFOF ¶ 8; PPFOF ¶ 8.)

OCD is an anxiety-related disorder. Individuals with OCD generally have intrusive, unwanted thoughts on a recurring basis, making them obsessive. (DPFOF ¶ 9.) These obsessions often relate to a compulsive behavior. For example, someone may be obsessed with cleanliness. This obsession can manifest itself in compulsive hand washing that is so continuous that a person begins to rub through one's skin. (DPFOF ¶ 10.) Some individuals with OCD have a symptom known as

2

scrupulosity. They may view themselves as hopelessly sinful if they do anything they perceive to be wrong or immoral.  Others may pray compulsively, thousands of times a day. (DPFOF ¶ 11.)

Benz generally worked the night shift from 11:00 p.m. to 7:30 a.m. (DPFOF ¶ 12; PPFOF ¶ ¶ 10, 11.)    Benz's typical duties on the night shift at the Lake House OCD unit were auditing charts, checking for medication errors, monitoring patients, doing checks throughout the house, organizing the refrigerator, printing out notes from the previous day and organizing and compiling charts.  (PPFOF ¶ 12.)  In the Spring of 2004, Mr. Benz asked if he could reduce his schedule to two shifts per week, for medical reasons.  He also asked for a permanent reassignment to the Child and Adolescent Center ("CAC"). (DPFOF ¶ 14.)  Rogers Memorial granted Benz's requests. In March of 2004, he began working in the CAC. (DPFOF ¶ 15.)

Beginning April 12, 2004, Benz worked two shifts per week. (DPFOF ¶ 16.)  In late May or early June, Benz returned to full-time work. (DPFOF ¶ 17.)  Benz continued working in the CAC and also worked on the OCD unit at this time. (DPFOF ¶ 18.)

Rogers Memorial created its CAC in January of 2003, five months before Benz began working at Rogers Memorial. (DPFOF ¶ 19.)  The CAC started as a 10-bed unit.  It was intended for children between the ages of 12 and 18 who suffered from psychiatric or mental disorders.  It was intended for children who had been unsuccessful in other treatment programs and who were not doing well in their psychological or personal life, e.g., home relationships, peer relationships, academics, etc. (DPFOF ¶ 20.)  Sometime between January and March of 2004, the CAC expanded to 24 beds.  At this time, it also began to include children with OCD. (DPFOF ¶ 21.)

OCD affects children differently from the way it affects adults. Adults normally have intrusive thoughts involving a variety of cleansing and washing rituals. Children, on the other hand,

generally exhibit an exaggeration of normal childhood developmental fears. (DPFOF ¶ 24.) For example, some children with OCD have exaggerated feelings surrounding normal sexual development. These children may feel that normal thoughts of sexuality are wrong and they will punish themselves for those thoughts by harming themselves. (DPFOF ¶ 25.) Also, children with OCD are far more likely to have co-morbid illnesses. Co-morbid illnesses are secondary diagnoses such as depression or other conditions in addition to OCD. (DPFOF ¶ 26.)

Most of the children in the CAC have depression in addition to other disorders. Many of the children with OCD have malignant OCD, which means they have been resistant to treatment in the past. (DPFOF ¶ 27.) Since 2004, the CAC has had two treatment tracks: (1) the general track; and (2) the cognitive-behavioral therapy track ("CBT"). (DPFOF ¶ 28.) The children on the general track have general psychiatric problems such as depression, substance abuse and anxiety disorders. The children on the cognitive behavioral track have a greater tendency toward obsessive-compulsive disorders and more acute anxiety disorders. (DPFOF ¶ 29.)

One of the most important job duties for every employee of Rogers Memorial is to ensure the physical and emotional safety of its residents. (DPFOF ¶ 32.) Rogers Memorial restricts access to materials which may be inappropriate or harmful to residents. For example, alcohol, lighters and candles are not allowed on any residential unit. (DPFOF ¶ 35.) However, the plaintiff notes that Rogers Memorial does not screen material that is brought into the units to see if they are harmful to the patients. (Pl.'s Resp. to DPFOF ¶ 35.)

Benz claims that he has been a member of the Wiccan religion since 2002. (DPFOF ¶ 41.) Benz's belief in the Wiccan religion and in the entire living Greco Roman pantheon is a sincerely held belief. (PPFOF ¶ 28.) According to Benz, the Wiccan religion involves components of

4

witchcraft and neopagan spirituality. It includes a belief in various gods and goddesses, but considers all gods to be one god and all goddesses to be one goddess. (DPFOF ¶ 42.) All Wiccans believe in some form of what is commonly known as the "Threefold Law" or the "Law of Three." (PPFOF ¶ 32.) Generally the Threefold Law states "Beware what you send into the world, it comes back to you good or bad times three." (PPFOF ¶ 33.)

As part of his religion, Benz created a "Book of Shadows" for himself by transcribing spells from various authors and other sources. (DPFOF ¶ 43.) Benz believes that most members of the Wiccan religion create their own Book of Shadows or a similar document. (DPFOF ¶ 44.) The organization and content of each Book of Shadows is unique, based on each person's personal choice and preference. (DPFOF ¶ 45.)

There is no religious requirement for Benz, or other Wicca, to keep their Book of Shadows with them at all times, or even to have it on specific dates or times. (DPFOF ¶ 47.) Benz normally keeps his Book of Shadows at his home. (DPFOF ¶ 48.) Benz uses his Book of Shadows as a reference on the conduct of particular spells; when he adds spells that are of particular interest to him; or as-needed based on his feelings (DPFOF ¶ 49.) Various spells in Benz's Book of Shadows describe prayers to the Goddess, giving thanks to the Goddess, and asking the Goddess for guidance and protection. (PPFOF ¶ 41.)

The following are some of the spells contained in Benz's Book of Shadows:

TO SILENCE A LIAR

Take a black figure candle, carve the person who is lying name [sic] and any other info into the figure.

Using a hot nail melt away the mouth. Smooth the mouth area over so you can't even tell there was a mouth there, then bind the mouth area with black thread.

Using a knife or nail hollow out a small hole in the area of the heart. Inside the hole, sprinkle a little bit of graveyard dirt and (if you wish) a drop of your own blood, . . again using the hot nail or hot knife remelt the wax over the hole until the contents are sealed in.

LIAR LIAR PANTS ON FIRE

You will need:

underwear of the lying person (if not buy a pair and write the name of the offending person in the crotch of the underwear with a black marker. [sic]

A bottle of the hottest Tabasco sauce you can find.

A bit of thistles and nettles, and cinquefoil (to urge them to tell the truth), black pepper, rubbing alcohol, a lighter or matches . . . .

Pour the Tabasco sauce on the crotch of the underwear. Let it dry. Sprinkle the herbs and black pepper. Sprinkle with a bit of alcohol (just a tad) Use the lighter or matches (better to have a long match) Burn in an old cauldron or outside grill . . . .

Scatter the ashes off your property, better to bring it to a field or cemetery.

REVENGE SPELL

On the black candle write your enemy's name 5 times, backward into the candle preferably with a rusty nail. Anoint with urine or blood or menstrual blood.

The purpose of this spell is to have a magical "hearing" regarding a person who has in some or many ways unjustly abused power over children, mothers and families that are vulnerable or could be considered, "at-risk."". . .

On an altar . . .Make a circle of pine needles In the circle center will be a poppet doll. This will have written on it the name, Stephany? on the TRUNK of the doll. "This poppet we name Stephany born on (if you know) and will represent her in all of her doings." (visualize this doll being Stephany) [sic] . . . .

Imagine another presence, angelic yet stunning in beauty holding scales of judgment…and a sword of retribution with licking flames. Feel their glare like fire. Feel them staring at you.

6

Visualization is a key part of magick [sic], you must see that what you are doing is correct and justified…unequivocably. . . .

Hold the poppet, firmly, angrily…

Each of you in turn.. will cut off a limb of the poppet that represents Stephany. This is symbolic. You aren't making her a paraplegic. Rather, she will be unable to act or strike back as Judgment is summoned and carried forth.

(alternating. Left arm) "I weaken you, I cut off your strength I cut off your power to oppress women and children."

(Cut the rt arm off) "I weaken you, I cut off your strength I cut off your power to oppress women and children."

Her head…drip candle wax onto the mouth…

"We silence you, and bring your own obsessive compulsive level of judgment and irrational hate back onto you… And YOU alone.  That none else may be harmed by you or your cruel decisions and lies."

(get ready to snip the legs and repeat for each leg)

"We weaken you. We slow you down So that you may not run Nor hide from the Kindly Judgment." . . .

The poppet and candles that will be used…throw them and the black altar cloth into a living body of water such as the Milwaukee river late at night when no one is looking.

(DPFOF ¶ 55.)

Benz worked on the north wing of the CAC from 11:00 p.m. on July 21, 2004, to 7:30 a.m. the following morning. (DPFOF ¶ 56, PPFOF ¶ 52.)  During that shift, Benz brought his Book of Shadows to work in order to transcribe spells, which is a necessary function of maintaining his Book of Shadows. (DPFOF ¶ 57; PPFOF ¶¶ 53, 54.)  There was no religious requirement for Benz to have the Book of Shadows with him during his shift that day. (DPFOF ¶ 58.)  The workstation in the CAC's dayroom is where Benz spent most of his time during this shift and Benz was at this

7

workstation when he reviewed his Book of Shadows. (DPFOF ¶¶ 59, 61.) The dayroom is a common area where residents can gather or watch television. (DPFOF ¶ 60.)

When Benz left Rogers Memorial at the end of his shift, he mistakenly left his Book of Shadows behind. (DPFOF ¶ 63; PPFOF ¶ 59.) While Benz is not sure where he left his Book of Shadows, he has acknowledged that it most likely would have been left on or near the workstation in the dayroom of the CAC. (DPFOF ¶ 64.) The desk where Benz left his Book of Shadows is a public area which is accessible to residents. (DPFOF ¶ 65.) Benz notes that one side of the workstation is set up for the staff to work and residents are not allowed to go on that side of the workstation. (Pl.'s Resp. to DPFOF ¶ 65; PPFOF ¶ 50.) By mistakenly leaving his Book of Shadows in the dayroom of the CAC, Benz had no control over who might see it or how they might interpret it. (DPFOF ¶ 66.)

Rogers Memorial ended Benz's employment on July 22, 2004. (DPFOF ¶ 67.) That morning Mary Winter, a Residential Counselor on first shift, alerted Bob Mills that she had found a binder in the dayroom on the north wing of the CAC. (DPFOF ¶ 68.) Bob Mills ("Mills") is the Manager of the CAC. (DPFOF ¶ 69.) Because Ms. Winter thought the binder belonged to a resident, Mills told her to alert the social workers so they could review it and determine what should be done. (DPFOF ¶ 70.) Ladd White ("White") is a social worker at Rogers Memorial who works as an Alcohol and Drug Abuse Specialist/Therapist on the CAC. (DPFOF ¶ 71; PPFOF ¶ 61.) On the morning of July 22, 2004, White was told that a binder had been found on the desk in the dayroom on the north wing of the CAC. (DPFOF ¶ 72.)

White was asked to review the binder to see if it belonged to one of the children with whom he worked. When he spoke to Mary Winter about the binder, she mentioned that Benz had worked

the night shift on that unit. Mr. White and Ms. Winter compared the handwriting in the binder to Benz's chart notes. They appeared to match. (DPFOF ¶ 73.) White then called Benz to ask him about the binder. (DPFOF ¶ 74.) During that conversation, Benz confirmed the binder was his and White expressed his concern about where the binder had been found and its contents. White stated that if one of the residents would have reviewed the binder, that could have been problematic. (DPFOF ¶¶ 75.) White was concerned about the binder, in part, because of the writing on the cover. White believed this writing to be "cult-like." (PPFOF ¶ 63.) During this conversation, White told Benz that he felt there were satanic runes on the book, and that it referenced a lot of cult-like activities. (PPFOF ¶ 69.)

During this conversation Benz told White he was a pagan and that the binder was a religious text and Benz would like it back. (DPFOF ¶ 76; PPFOF ¶ 68; Benz Dep. at 208, line 19, at 209, lines 2-3.) This was the first time Benz had disclosed his religious beliefs to anyone at Rogers Memorial. (DPFOF ¶ 77.) Benz asked White to return his binder. White explained that he was giving it to Mills. (DPFOF ¶ 78.) After this conversation, White gave the binder to Mills and told Mills that the binder belonged to Benz. White did not tell Mills that the binder was a religious text of any type. (DPFOF ¶¶ 79, 80.) After his conversation with White, Benz left a voice message for Mills in which he stated that the Book of Shadows was his religious text and asked for its return. (DPFOF ¶ 80.)

Mills informed Sarah Sheridan, the Director of Residential Services, that a binder belonging to Benz had been found in the dayroom on the CAC. Ms. Sheridan advised him to give it to Renee Patterson ("Patterson"), Rogers Memorial's Vice President of Employment and Training Services. (DPFOF ¶ 81.) Mills took the binder to Patterson, who is responsible for human resources. (DPFOF ¶¶ 82, 83) Mills told Patterson that the binder had been found in a public area of the CAC. He told

9

her the binder had been left there by a third-shift employee and that he found its contents disturbing. (DPFOF ¶ 84.) Patterson reviewed the entire binder and made a photocopy of it. (DPFOF ¶ 85; PPFOF ¶ 77.) After reviewing the binder, Patterson met with Mills again to verify where the binder had been found and how Rogers Memorial had verified its owner. (DPFOF ¶ 86.) Mills related the foregoing, and after her discussion with Mills, Patterson decided to terminate Benz. (DPFOF ¶¶ 87, 88.)

Patterson made the decision to discharge Benz before she spoke with Benz. Her decision was based solely on her review of the contents of his Book of Shadows and she claims that her determination that some of the material in that book could have been harmful to the children in the CAC motivated her decision to terminate Benz. (DPFOF ¶ 89.) Patterson contacted Benz to set up a meeting at Rogers Memorial. (DPFOF ¶ 90.) She left a voice message on Benz's cell phone stating that she had urgent concerns and needed to speak with him immediately. (DPFOF ¶ 91.) When Benz returned the call, he told Patterson that a text of his had been left at Rogers Memorial and he wanted it back. (DPFOF ¶ 92.) Patterson told Benz that he needed to come to Rogers Memorial as soon as possible. A meeting was scheduled for approximately 1:45 that afternoon. (DPFOF ¶ 93.) During this conversation, Benz claims tho have identified his Book of Shadows as a religious text. (PPFOF ¶ 80.)[1]

_____

[1] Rogers Memorial argues that Benz's affidavit contradicts his previous deposition testimony and therefore this proposed finding of fact should be disregarded. However, in his deposition, Benz testified that in his conversation with Patterson he "was trying to articulate to her that a religious text" had been left at work. (Benz Dep. at 210, lines 16-18.) Therefore, his subsequent affidavit does not appear to be contradictory. Thus, this court will not disregard this finding but rather, the court will note that whether Benz told Patterson that the binder was a religious text during this telephone conversation is in dispute.

At that time, Benz, Patterson, and Mills met in Patterson's office. (DPFOF ¶ 94.) Benz was given his Book of Shadows and asked if it was his. He reviewed it and acknowledged it was his religious text. (DPFOF ¶ 95; PPFOF ¶ 83.) Benz claims he informed Patterson he was Wiccan. Benz stated that he was a Wiccan and that the Book of Shadows was his religious text as a Wiccan. (PPFOF ¶ 85.) Patterson does not recall Benz identifying himself as Wiccan during this meeting. (DPFOF ¶ 96.) The first time Mills recalls having any awareness that Benz's notebook had any religious significance was during this meeting. However, Mills also does not recall Benz stating what his religion was. (DPFOF ¶ 97.)

During the meeting, Benz asked Patterson which parts of his Book of Shadows were offensive to her, and she replied "the whole thing." (PPFOF ¶ 87.) Mills stated that Benz attempted to engage in a religious rights discussion with Patterson about the issues surrounding his termination. (PPFOF ¶ 88.) Patterson also held up the Book of Shadows and shook it stating "I don't know what you're trying to sell here Tom, but this is not a religion but a binder with papers." (PPFOF ¶ 91.) Benz admitted that he voluntarily brought his Book of Shadows onto the CAC and that an honest mistake led to it being left behind in a patient accessible area. (DPFOF ¶ 98.) Patterson informed Benz that he was being discharged. (DPFOF ¶ 99.)

According to Patterson, any employee who brought materials describing sex, violence, or assault to work, and handled those materials in a way which made them accessible to residents, particularly children, would be terminated. (DPFOF ¶ 100.) Benz disputes Patterson's contention because there was no policy or practice in place with respect to the type of material that was allowed to be brought in by the third shift residential counselors on the CAC. (Pl.'s Resp. to DPFOF ¶ 100; Sheridan Dep. at 14, lines 13-16.) Patterson testified in her deposition that if an employee had left

11

a copy of Mel Gibson's movie, "The Passion," in a public, patient-accessible area of the CAC, where children could have seen it without staff knowledge or supervision, that employee also would have been fired. (DPFOF ¶ 101.)

In Patterson's opinion, Benz's Book of Shadows included references to violence, vengeance, harm, and sexual references which were inappropriate for any child, much less a child on a psychiatric unit, to review without supervision. The Book of Shadows also referenced and encouraged prohibited actions such as burning candles. (DPFOF ¶ 102.) Patterson had no objection to Benz bringing his Book of Shadows to work so he could review it when it would be inaccessible to patients. However, she objected strenuously to leaving the Book of Shadows in a public area of the CAC. (DPFOF ¶ 103.) Benz has acknowledged that he is not personally aware of any other employee of Rogers Memorial who brought personal property to work and mistakenly left it in a patient accessible area. (DPFOF ¶ 104.)

It is difficult for children on the CAC to review Mr. Benz' Book of Shadows with the same detachment and rational logic as an adult who is not suffering from severe emotional issues or psychiatric disorders. (DPFOF ¶ 105.) Some of the children on the CAC have been abused, raped, or sexually abused. (DPFOF ¶¶ 106, 107.) A number of these children suffer from painful memories of emotional, physical, or mental abuse from parents or loved ones. (DPFOF ¶ 108.) Many of these children have problems with self-harm or self-abuse. (DPFOF ¶ 109.) Benz has acknowledged that if a child with OCD had reviewed his Book of Shadows, its contents could have caused anxiety in that child and could have had a detrimental effect on that child's therapy. (DPFOF ¶ 110.) Benz has also conceded that it is possible that some of his spells could exacerbate the delusions of a psychotically delusional child. (DPFOF ¶ 111.)

Employees at Rogers Memorial are permitted to bring DVDs or movies with them when they work second or third shift. Patterson encouraged employees to bring these types of materials with them during their shifts. (PPFOF ¶ 148.) Patterson has taken no steps to have movies reviewed before the Rogers Memorial employees showed them. (PPFOF ¶ 149.) Personal reading was encouraged by night shift residential counselors upon completion of their work or if they had finished a task or were taking a break. (PPFOF ¶ 152.)

Rogers Memorial controls access to spiritual or religious materials in the CAC. The therapy staff needs to be aware of what the children are reading. Some children have religious obsessions which may cause them to spend an inordinate amount of time reading the Bible. For example, one child in the CAC believed that she needed to say one million Hail Marys for every cross she saw in a day. If she was interrupted, she would have to begin again. (DPFOF ¶ 39.) Another child in the CAC believed she had sinful thoughts. To punish herself, she would drop herself off her bed, on top of her head. (DPFOF ¶ 40.) For that reason, Bibles are not readily accessible to the residents. (DPFOF ¶ 36.) However, White, an employee who also works on the CAC, testified that once a resident requests a Bible, no steps are taken to monitor how that Bible is being used, unless a problem is brought to the staff's attention. (Pl.'s Resp. to DPFOF ¶ 36.)

Before Rogers Memorial makes any religious material available to a patient, it determines if exposure to that material presents any clinical risk. Rogers Memorial may deny a request for a Bible from a child with hyper-religious thoughts or religious delusions. (DPFOF ¶ 38.) Yet, White testified that he did not know of anyone who requested a Bible and was refused. (White Dep. at 29, lines 12-14.) Additionally, there is a Bible among the books on the book shelf in the OCD unit (which now only houses adults but previously also housed children). (PPFOF ¶ 107.) According to

Dr. Lake, the Bible in a specific clinical situation could also be harmful to a patient. (PPFOF ¶ 108.) There is also a "Spirituality Binder" among the books on the book shelf in the OCD unit. (Lepple Dep. at 16, lines 11-14.) Phil Lepple, a residential counselor in the OCD unit, created the "Spirituality Binder" in April of 2002. From the time the "Spirituality Binder" was created until January 2004, the OCD unit where Lepple worked did house children. (PPFOF ¶ 113.) The Spirituality Binder was available for residents upon request and was usually in a common area for resident access. (PPFOF ¶ 117.) The "Spirituality Binder" contains several postings and flyers about Christian religious-based gatherings and events and a listing of the location of local churches. (PPFOF ¶ 118.)

The Spirituality Binder also contains a document called "God's Yellow Pages," which is an alphabetical list of adjectives and verbs with corresponding biblical passages. (PPFOF ¶ 122.) "God's Yellow Pages" essentially directs the reader to certain biblical passages associated with a particular word. (PPFOF ¶ 123.) For example, for the word "Adultery," the document directs the reader to "Matthew 5:27-32." (PPFOF ¶ 124.) Matthew 5:27-32 states in pertinent part, "If your right eye causes you to sin, gouge it out and throw it away." And, "if your right hand causes you to sin, cut it off and throw it away." (PPFOF ¶ 125.) The document also references various Biblical passages that arguably reference self-harm, suicide (i.e. "offer your bodies as living sacrifices"), violence, aggression, the use of candles (i.e. "whole burnt offerings to delight you"), and cleansing and washing rituals. (*See* PPFOF ¶¶ 127, 128, 130, 131, 135, 138, 141.)

Dr. Peter Lake is Rogers Memorial's Medical Director. Dr. Lake is Board certified in the practice of child, adolescent, and adult psychiatry. (DPFOF ¶ 112.) In Dr. Lake's opinion, the fact that Benz's Book of Shadows was left unattended, in a patient-accessible area, presented an

immediate clinical risk to the safety of the children in the CAC. (DPFOF ¶ 113.)  In Dr. Lake's opinion, the risk of certain children committing suicide could have been extremely high if they reviewed certain passages of the Book of Shadows. (DPFOF ¶ 115.)  Dr. Lake also was disturbed by the spells which involved dismembering clay puppets or made specific references to genitalia. (DPFOF ¶ 116.)  Some of the children on the CAC had experienced sexual abuse or had become aggressive because of past abuse. Many of the children had injured themselves or experienced disassociative episodes relating to past abuse. For these children, Dr. Lake was very concerned about any spells that referenced sexual activity, aggression, or self-harm. (DPFOF ¶ 117.)

Various books are available to residents in the OCD unit for their review without staff supervision that reference aggression, sexual activity, suicide, witchcraft, and violence.  Rogers Memorial notes that these books are only available to adults in Rogers Memorial's OCD unit. (Def.'s Resp. to PPFOF ¶¶ 155-57.)  For example, the book *The Devil*, which includes cultural and literal references to the Devil, is available to residents without staff supervision. (PPFOF ¶ 165.) Furthermore, the book *A Village Affair*, which describes a wife and mother who has a lesbian love affair with another woman,  is available to residents without staff supervision.  (PPFOF ¶ 159.) Leah Maas worked in the Rogers Memorial Eating Disorder unit as a residential counselor from July 2001 through August 2004.  (PPFOF ¶ 166.)    Employees in the eating disorder unit were specifically instructed to avoid bringing in diet magazines, or other magazines and material with photos of models or extremely thin women, presumably because of the harm these images could potentially cause to the patients in the Eating Disorder unit if reviewed without supervision.  (PPFOF ¶ 167.)  On occasion employees would leave these restricted magazines or material out and unattended in patient accessible areas.  (PPFOF ¶ 168.)  No employee was ever reprimanded or

terminated for leaving out and unattended in patient-accessible areas restricted magazines or material. (PPFOF ¶ 169.)  There was never any message or indication that an employee would be terminated for leaving such material or magazines out and unattended in patient accessible areas.  (PPFOF ¶ 170.)  In the event that an employee would leave restricted material unattended in patient accessible areas, they were told to "put it away."  (PPFOF ¶ 171.)

Dr. Lake admits that he has no evidence that Benz talked to a patient about the contents of his Book of Shadows.  (PPFOF ¶ 180.)  Benz never spoke with any of the residents regarding the fact that he is a Wiccan. (PPFOF ¶ 181.)  Dr. Lake defines Mr. Benz's behavior in leaving his Book of Shadows out in the open as causing a "certain situation in child psychiatry when suicide and death is the ultimate risk factor where you simply can't take a chance on whether someone is sharing the material with them or not." (PPFOF ¶ 184.)  In light of this "ultimate risk factor", however, Dr. Lake admits that he did not report the incident based on the mandatory reporting requirements of the State of Wisconsin for patient abuse. (PPFOF ¶ 185.)  Despite Dr. Lake's stated concerns, no investigation was conducted to ascertain if any patients actually saw Mr. Benz's Book of Shadows. (PPFOF ¶ 187.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than some metaphysical doubt as to the material facts." *Albiero v. City of Kankakee*, 246

17

F.3d 927, 932 (7th Cir. 2001) (internal quotations omitted). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252). Because the parties in this case have filed cross motions for summary judgment, the court must extend the required favorable inferences to each when considering the other's motion. *See McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683, 687 (7th Cir. 1991).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.  ANALYSIS

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Religion, in turn, includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Both parties agree that this is not an "accommodation" case. Rather, the central issue is whether Rogers Memorial was motivated by the defendant's religion, or more specifically, the religious beliefs it may have imputed to Benz, when it decided to terminate him. Thus, to prevail on his motion for summary judgment, Benz must demonstrate that "[his] perceived religious shortcomings . . . played a motivating role in [his] discharge. *Venters v. City of*

18

*Delphi*, 123 F.3d 956, 972 (7th Cir. 1997). Benz can demonstrate Rogers Memorial's discriminatory intent under either the "direct" method or the "indirect" method of proof.

A plaintiff proceeding under the "direct method may rely on two types of evidence: direct evidence or circumstantial evidence." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998) (internal quotations omitted). Direct evidence is evidence that may "'be interpreted as an acknowledgment of discriminatory intent by the defendant.'" *Rudin*, 420 F.3d at 720 (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Simply stated, "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000)). Admittedly, direct evidence establishing an employer's discriminatory intent is rare.

A plaintiff may also prevail under the direct method by establishing a "convincing mosaic" of circumstantial evidence that "allows a jury to *infer* intentional discrimination by the decision-maker." *Id.* (emphasis added). Circumstantial evidence "may come in the form of 'suspicious timing, ambiguous statements oral or written, [or] behavior toward or comments directed at other employees in the protected group.'" *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 736). The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Case 2:04-cv-01079-WEC   Filed 02/09/06   Page 19 of 27   Document 51

A plaintiff proceeding under the indirect method, as established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of a protected class. *See Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005). "The failure to establish any one of the initial four elements [of a prima facie case] defeats a discrimination claim." *Bio v. Federal Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005). If the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision. *McDonnell Douglas*, 411 U.S. at 802. Then, if the defendant articulates a legitimate, nondiscriminatory reason, the burden of production shifts back to the plaintiff to show that the defendant's explanation was pretextual. *Ineichen*, 410 F.3d at 961.

To demonstrate pretext, Benz must show that Rogers Memorial's articulated reason for terminating him either: "(1) had no basis in fact; (2) did not actually motivate [his] discharge; or (3) was insufficient to motivate [his] discharge." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). Pretext requires more than a showing that the decision was "mistaken, ill considered or foolish . . . so long as [the employer] honestly believes [in the reason presented], pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). "Pretext is 'a dishonest explanation, a lie rather than an oddity or an error.'" *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000)). Simply put, "pretext means deceit used to cover one's tracks." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir.2001) (internal quotations omitted). It is also worth noting that, although the burden of production shifts under the *McDonnell Douglas* test, "'[t]he ultimate burden

20

of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

However, before proceeding under the "direct" or "indirect" approach, Benz must first establish that Rogers Memorial knew of his religious beliefs prior to its decision to terminate him. This is because, in a religious discrimination case, the plaintiff's membership in a protected class is not readily discernable. *See Reed v. Great Lakes Companies, Inc.*, 330 F.3d 931, 934 (7th Cir. 2003). Rogers Memorial argues that "Benz has failed to present evidence which would allow a reasonable jury to find that Rogers Memorial knew he was Wiccan, or that his Book of Shadows was a religious text, before deciding to end his employment." (Def.'s Br. in Support of Mot. for Summ. J. ("Def.'s Br.") at 5.)

It is undisputed that Benz did not disclose his religious beliefs to anyone at Rogers Memorial until July 22, 2004, the date of his discharge. (DPFOF ¶¶ 76, 77.) However, when White called Benz to ask him whether the binder belonged to him, Benz did inform White that he was a pagan and that the binder was a religious text. (DPFOF ¶ 76.) During this conversation, White, based upon his brief review of the binder, told Benz that the binder referenced a lot of "cult-like" activities. (PPFOF ¶ 69.) While there is no evidence that White told Mills that the binder was allegedly a religious text, Benz did call Mills and left him a voice message in which he told Mills that the binder was a religious text. (DPFOF ¶ 80.) Mills, however, does not recall knowing that the binder had any religious significance until the meeting later that afternoon during which Benz was terminated. (DPFOF ¶ 97.)

After Mills gave the binder to Patterson, Patterson reviewed the binder in its entirety and made a photocopy of each page in the binder. Patterson then allegedly made the decision to discharge Benz, before she spoke with him, and this decision was based solely on her review of the contents of his Book of Shadows and her determination that some of the material in the Book of Shadows could have been harmful to the children in the CAC if reviewed without supervision. (DPFOF ¶ 89.) Because Patterson made the decision to terminate Benz prior to learning that the binder was a religious text, and rather based her decision solely upon her review of the contents of the binder, Rogers Memorial argues that she could not have been motivated by a discriminatory intent when she made the decision to discharge Benz.

Benz argues that, even if Patterson's decision to terminate him was based *solely* upon her review of the binder, because "the Book of Shadows itself clearly identifies itself as a religious text," she could have been motivated by an animus toward individuals who hold the religious beliefs expounded in the Book of Shadows when she made the decision to discharge Benz. (Pl.'s Br. at 17.) Specifically, Benz argues that because the Book of Shadows contains numerous references to Gods and Goddesses as well as prayer, Patterson could have concluded that the binder was a religious text and based her decision to discharge Benz upon an animus toward individuals who hold the beliefs expounded in the binder. Indeed, the Book of Shadows does contain numerous references to Gods, Goddesses, and prayer. For example, one spell states:

> Naked come I into this sanctuary With love and faith From those who have gone before. Innocent am I in understanding Holey and pure in my love of all good and blessed things. Supreme Goddess, ruler of light, Lord of all Hear my prayer, Help me now to dispel this thing of unholiness This creature of darkness, Who dooms itself to shame and unhappiness. Save him if it is they will to do so. Sen[d] him to the light. Mercy is the song I sing; Forgiveness is the word most precious. In they everlasting grace I say this. In humility I ask this. So mote [sic] it be.

22

(PPFOF ¶ 45.) (emphasis added).

Moreover, based upon his brief review of the contents of the binder, White apparently came to the conclusion that the activities referenced in the binder were "cult-like," thereby suggesting that, based upon even a cursory review of the binder, one could conclude that the activities referenced in the binder were of a religious nature. (PPFOF ¶¶ 63, 69.) It is undisputed that when Patterson reviewed the binder, she read every page and also personally made a photocopy of every page in the binder. (DPFOF ¶ 85; PPFOF ¶ 77.) Taking the facts in a light most favorable to the plaintiff, this court concludes that a reasonable jury could conclude that Patterson knew that the binder was a religious text of some sort based solely upon her review of the binder. Of course, a reasonable jury could also conclude that Patterson did not know that the binder was a religious text when she made the decision to discharge Benz. Thus, there is a genuine issue of material fact regarding whether Patterson was aware that the binder was a religious text of some sort when she made the decision to discharge Benz.

If the jury concludes that Patterson knew that the binder was a religious text when she made the decision to discharge Benz, Benz must next establish Rogers Memorial's discriminatory intent under either the "direct" or "indirect" method of proof. Benz argues that because he was terminated for inadvertently leaving his Book of Shadows at work, and the Book of Shadows is a religious text, he has presented direct evidence that he was terminated because of his religion. (Pl.'s Br. at 20.) However, Benz has not produced any evidence that could "be interpreted as an acknowledgment of discriminatory intent by [Rogers Memorial]," and therefore, he has not produced any direct evidence

23

of intentional discrimination.[2]  *Troupe*, 20 F.3d at 736.  Rather, Benz argues, under the direct method, that he has established "a convincing mosaic" of circumstantial evidence from which a reasonable jury could infer intentional discrimination by Rogers Memorial.

In support of this argument, Benz has presented evidence that a "Spirituality Binder," including a document called "God's Yellow Pages" was available to the children housed on the OCD unit, that is, while children were housed in that unit, until January of 2004.  (PPFOF ¶¶ 122, 123.) "God's Yellow Pages" references various Biblical passages that arguably reference self-harm, suicide (i.e. "offer your bodies as living sacrifices"), violence, aggression, the use of candles (i.e. "whole burnt offerings to delight you"), and cleansing and washing rituals.  (*See* PPFOF ¶¶ 127, 128, 130, 131, 135, 138, 141.)  For example, for the word "Adultery," God's Yellow Pages directs the reader to Matthew 5:27-32.  (PPFOF ¶ 124.)  Matthew 5:27-32 states in pertinent part, "If your right eye causes you to sin, gouge it out and throw it away."  And, "if your right hand causes you to sin, cut it off and throw it away."  (PPFOF ¶ 125.) Also, there is a Bible available for review without staff supervision in the OCD unit (which now only houses adults but previously also housed children until January of 2004). (PPFOF ¶ 107.)

Benz has also presented evidence that various books that are available to the adult residents in the OCD unit, without staff supervision, reference aggression, sexual activity, suicide, witchcraft, and violence.  There has been no evidence presented specifically showing that these texts were also

---

[2]  In his brief, Benz seems to argue that there is direct evidence of discrimination in this case. (Pl.'s Br. at 20.) Benz, however, has confused the direct method of proof with direct evidence of discrimination.  This confusion is understandable, as "[t]here are several cases that arguably conflate the direct method with direct evidence." *Rogers*, 320 F.3d at 754; *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 941 (7th Cir.1997) ( "The confusion lies in the fact that the direct method may employ circumstantial evidence along with or for that matter in place of 'direct' evidence . . . which in an employment discrimination case would normally require an admission.").

24

available to the children housed in the OCD unit for review without staff supervision, that is, when children were housed in that unit. However, Rogers Memorial has stated that since 2000 (thereby encompassing the period of time when children were housed in the OCD unit) these various books were kept in public areas of the OCD unit and were accessible to "residents" without staff supervision. (Anderson Aff., Ex. 1, at 2.) For example, the book *The Devil*, which includes cultural and literal references to the devil as well as allegedly graphic images, was available to OCD unit residents for review without staff supervision, during the period of time when children were housed in that unit. (PPFOF ¶ 159.) And, the book *A Village Affair*, which describes a wife and mother who has a lesbian love affair with another woman, was available to OCD unit residents for review without staff supervision, during the period of time when children were housed in that unit. (PPFOF ¶ 165.)

As further support for his "mosaic," Benz also relies upon the fact that when residential counselors in the Eating Disorder unit brought in restricted materials, that is, materials that could potentially be harmful to the patients in that unit if they were to view them without staff supervision, those residential counselors were simply told to "put [the restricted materials] away." (PPFOF ¶¶ 167, 168, 171.) Benz has also presented evidence that during the meeting in which Benz was discharged, Benz asked Patterson which parts of his Book of Shadows were offensive to her, and she replied "the whole thing." (PPFOF ¶ 87.) Also, at some point during this meeting, Patterson allegedly held up the Book of Shadows and shook it stating "I don't know what you're trying to sell here Tom, but this is not a religion but a binder with papers." (PPFOF ¶ 91.) Finally, Benz has presented evidence that during the meeting, when Benz was having trouble removing his keys to Rogers Memorial from his key chain, he allegedly asked Patterson for help and she allegedly replied that "she wasn't touching anything of [his]." Benz Dep. at 213, lines 13-20.

25

Taking these facts in a light most favorable to the plaintiff, this court concludes that Benz has established a "convincing mosaic" of circumstantial evidence from which a reasonable jury could infer that Patterson terminated Benz because of "[his] perceived religious shortcomings." *Venters*, 123 F.3d at 972. The Seventh Circuit has held that "a combination of . . . circumstantial evidence, 'none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff,' may allow a plaintiff to surpass the summary judgment hurdle." *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (quoting *Troupe*, 20 F.3d at 737). In light of the fact that the plaintiff has met his burden under the "direct" method of proof, "the pertinent question [becomes] whether [Rogers Memorial's] evidence as to the legitimate reasons for terminating [Benz] eliminates any doubt as to whether religion played at least a motivating role in [his] discharge." *Venters*, 123 F.3d at 974. The answer is no. The competing inferences are clear.[3] While Rogers Memorial has presented evidence from which a reasonable jury could conclude that legitimate, nondiscriminatory reasons regarding child safety and well-being motivated Benz's discharge, a reasonable jury could also find that religion (or the religious beliefs Rogers Memorial may have imputed to Benz) played at least a motivating factor in his discharge. Taking the facts in a light most favorable to the plaintiff, " what role if any [his] religion (or [Rogers Memorial's] perception of [his] religion) played in [his] discharge is a question that the jury must sort out." *Id.*

## IV. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, this court concludes that there are genuine issues of material fact as to (1) whether Patterson knew the Book of Shadows was a religious text

---

[3] "[S]ummary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi*, 184 F.3d at 691 (quoting *Smith*, 129 F.3d at 425).

26

when she made the decision to terminate Benz, and (2) whether religion (or the religious beliefs imputed to Benz) played at least a motivating role in his discharge. Thus, the plaintiff's motion for summary judgment will be denied and the defendant's motion for summary judgment will also be denied.

**NOW THEREFORE IT IS ORDERED** that the plaintiff's motion for summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that a status conference be conducted on Friday, March 3, 2006 at 9:00 a.m. in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee, WI 53202, for the purpose of discussing with the parties the further processing of this case to resolution.

**SO ORDERED** this  9th  day of February 2006, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge